# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Creative Times Dayschool, Inc. ) | ASBCA Nos. 59507, 59779 |
| ) | |
| Under Contract No. W912DW-11-D-1018 ) | |

APPEARANCE FOR THE APPELLANT:     Judith Ward Mattox, Esq.
           Colorado Springs, CO

APPEARANCES FOR THE GOVERNMENT:     Thomas H. Gourlay, Jr., Esq.
           Engineer Chief Trial Attorney
           Ian D. Clunies-Ross, Esq.
           Engineer Trial Attorney
           U.S. Army Engineer District, Seattle

## OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

The government contracted with appellant, Creative Times Dayschool, Inc. (CTI), for paving and roofing work at a shipyard. CTI's claims include that (1) the government constructively changed the work, (2) CTI is entitled to delay costs, (3) CTI is entitled to recovery of professional consulting fees, and (4) the government improperly assessed liquidated damages for delayed completion of the work. A hearing was held and only entitlement is before us. We dismiss one appeal for lack of jurisdiction, and sustain the other in part.

## FINDINGS OF FACT

*General background*

In September 2011, the U.S. Army Corps of Engineers (government) awarded Single Award Task Order Contract (SATOC) No. W912DW-11-D-1018 to CTI for maintenance, repair, and construction work (R4, tab 3 at 1, 3). On 29 September 2012, the government awarded Task Order 0002 under the SATOC to CTI to perform roofing repairs and maintenance yard paving at Lake Washington Ship Canal in Seattle, Washington, for the fixed price of $398,644 (R4, tab 4 at 1-4). The task order identified six buildings requiring roofing work, and two areas requiring paving work (R4, tab 96). The task order completion date was 11 June 2013 (*id.* at 5, ¶ 3). On 9 October 2012, CTI received the government's notice to proceed with the work, effective that date (R4, tab 6).

The task order provides that "a Standard Construction Management Team (SCMT), as defined in Paragraph 4.1.2 of the [SATOC's] Statement of Work, is required for this Task Order" (R4, tab 4 at 5, ¶ 2). Paragraph 4.1.2 of the SATOC provides that "[a] Standard Construction Management Team is defined as having separate individuals serving as Superintendent, Quality Control Manager, and Site Safety and Health Officer" (R4, tab 3 at 53). Section 10.3.6 of the task order's statement of work provides that "[t]he superintendent may perform as the QC System Manager" (R4, tab 4 at 12).

Section 3.1 of the statement of work, Fall Arrest System, provides:

> Provide a roof fall arrest system which provides access to
> all parts of the roof without having to disengage the
> system.... The system at a minimum shall support three
> people at 300 hundred pound[s] each.

(R4, tab 4 at 9) In April 2013, CTI informed the government that its research "found there is no 3 man per 300 lb each rated system," and recommended "a two man 300 lb rated system" (R4, tab 12). The government responded that fall arrest systems were available that met the "three people at 300 pound each" contract requirement (*id.* at 1).

*Paving, roofing, and liquidated damages*

Section 9.1 of the task order's statement of work, Asphalt Pavement Overlay, provides that "[t]he contractor shall provide all the labor, equipment, and materials to provide a 2 inch asphalt overlay in the maintenance yard areas as shown in sketch 1" (R4, tab 4 at 11). Among the areas listed on and depicted in "sketch 1" to the task order are two "Maintenance Yard Paving" areas that, in sketch 1, are outlined in red and marked with the number "7" (R4, tab 4 at 25, tab 96). One of those, the "east section," is depicted in the lower right corner of sketch 1 (R4, tab 4 at 25; tr. 1/26, 33, 244-45). Before CTI bid on the contract, it attended a site visit during which the government's project lead is said to have stated, referring to the east section, that "[w]e don't believe that we have the money to do this, so we're not going to look at it" (tr. 1/23-25, 31, 93-94).

Sketch 1 also lists and depicts six buildings that are identified in section 2 of the task order's statement of work as requiring the installation of an "EPDM Roof Membrane Overlay System" (R4, tab 4 at 7, tab 96). Section 2.1 of the task order's statement of work provides:

> Provide EPDM roof membrane overlay system applied
> over new recovery/insulation board substrate which is
> sloped to provide positive drainage. The contractor shall

2

evaluate the existing roof system and submit for information only design details for the new roofing system. The design will incorporate surfaces which are rigid, clean, dry, smooth and free from cracks, holes and sharp changes in elevation. The contractor shall ensure that existing/new flashing, drains, control joints, expansion joints, and vents are in place prior to application of roofing materials.

(R4, tab 4 at 7)

The SATOC provides that "[i]f the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $482.00 for each calendar day of delay until the work is completed or accepted" (R4, tab 3 at 17). The SATOC also incorporates by reference FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 3 at 15), which provides, at paragraph (b):

> If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

On 8 February 2013, the government informed CTI that it was concerned with CTI's lack of progress in prosecuting the work, particularly because, the government stated, "weather conditions have been satisfactory for commencement of this work, yet no work has occurred" (R4, tab 7).[1] On 15 February 2013, CTI responded that it had decided to wait until the spring to begin the work, its subcontractor having advised that seven days of no precipitation were needed to start the work (R4, tab 8 at 1). On 24 April 2013, CTI notified the government of water trapped under the existing roofing of the "Generator Building," and recommended the removal of the existing roofing (R4, tab 13). On 25 April 2013, the government responded that CTI had the opportunity to assess the condition of the existing roof during the site visit and, thus, the government did "not acknowledge any time or cost impact associated with the work required to meet the performance standards" of the task order (*id.*).

---

[1] The government also stated that the contract completion date was 6 June 2013 (*id.*).

3

CTI followed up on 30 April 2013, characterizing the water as a differing site condition, and again proposed replacement of the existing roofing system (R4, tab 15). On 2 May 2013, the government informed CTI that it was evaluating the roofs, and asked CTI what the cost would be for "full roof replacement" (R4, tab 16). On 15 May 2013, CTI provided a cost breakdown (R4, tab 18 at 1-2). On 16 May 2013, CTI informed the government that:

> It is [CTI's] position that the asphalt work should be done at the end of the project in order to protect the new asphalt. We are concerned about driving heavy equipment on the new asphalt and the damage it will cause. There is no way we can complete the roofing project without accessing the area where the asphalt will be installed.

(R4, tab 38 at 25) We find that statement credible and uncontroverted, and accordingly find that CTI had to complete the roofing before commencing with paving.

On 24 May 2013, the government requested from CTI a proposal "to remove existing roof and replace" (R4, tab 20 at 1). CTI provided its proposal on 30 May 2013 (R4, tab 21 at 1-2). The parties negotiated terms for the roofing change (that is, full replacement of all six roofs) at least through 11 June 2013, including, according to a 10-11 June 2013 email string between CTI and the government's project lead, the following "main point":

> Duration: Contractor agrees to 90 calendar days from June 16th, 2013.

(R4, tab 22) On 13 June 2013, CTI provided a price proposal for removing and replacing all six roofs (R4, tab 24). On 17 June 2013, 54 days after CTI's 24 April 2013 notice to the government of water under the existing roofing, the parties signed Modification No. R00001, providing for the deletion of section 2.1 of the task order's statement of work, and its replacement with the following:

> The contractor shall completely remove the existing roof system to the concrete deck. The contractor will rebuild the roof by placing an adhered vapor barrier, 3 inches of closed-cell polyisocyanurate with glass reinforced mat facer insulation board, new recovery/insulation board substrate which is sloped to provide positive drainage and the EPDM roof membrane overlay. The new roof will incorporate surfaces which are rigid, clean, dry, smooth

4

and free from cracks, holes and sharp changes in elevation.
The contractor shall ensure that new flashing, drains,
control joints, expansion joints, and vents properly
installed and working prior to application of roofing
materials.

(R4, tab 5 at 2) Modification No. R00001 also added two new sections to the
statement of work, providing for new drains to certain of the project roofs (*id.*). The
modification states:

The contract completion date shall be extended by
90 calendar days by reason of this modification.

(*Id.* at 3) Ninety days after the original, 11 June 2013 task order completion date was
9 September 2013. Finally, the modification includes no express release language
(R4, tab 5).

On or about 12 June 2013, CTI wrote to the government that there was a
discrepancy between "what asphalt work was identified at the job walk and
subsequently bid and what asphalt work was identified in the [statement of work]"
(R4, tab 23 at 1). On 19 June 2013, the government informed CTI that "[t]he
Contractor is required to complete all paving work in this contract before the contract
completion date" (R4, tab 25). On 1 August 2013, the government directed CTI "to
proceed with asphalt paving work as required by contract," and "reminded [CTI] that
the completion date for this contract is 9 September 2013" (R4, tab 29). On 15 August
2013, CTI wrote to the government "confirm[ing] that the completion date remains
9 September 2013" (R4, tab 38 at 16). On 7 October 2013, CTI stated that "[o]n
**15 August 2013**, CTI...confirmed that it understood that the contract completion date
on the project remained 9 September 2013" (R4, tab 38 at 2).

CTI completed the work, and the government took beneficial occupancy, on
1 November 2013 (R4, tabs 40, 41). On 3 December 2013, the contracting officer sent
CTI a letter stating that CTI had finished work 53 days past the contract completion
date, and that "in accordance with contract requirements, the Government will retain
liquidated damages from your next pay request on this contract in the amount of
$25,546" (R4, tab 41). The government concedes that it has assessed liquidated
damages (gov't br. at 15).

*The Request for Equitable Adjustment, and subsequent appeals*

The SATOC incorporates by reference FAR 52.233-1, DISPUTES (JUL 2002)
(R4, tab 3 at 14), which provides, at paragraph (e):

> For Contractor claims of $100,000 or less, the Contracting
> Officer must, if requested in writing by the Contractor,
> render a decision within 60 days of the request. For
> Contractor-certified claims over $100,000, the Contracting
> Officer must, within 60 days, decide the claim or notify the
> Contractor of the date by which the decision will be made.

On 10 January 2014, CTI presented to the contracting officer a request for equitable adjustment (REA) in the amount of $348,126.05, including an express request for the "recission of all assessed Liquidated Damages" (R4, tab 44 at 1, 4, 10, 14, 16). The REA did not expressly request a contracting officer's final decision, but stated:

> While it is understood that the Government has 60 days to
> respond, CTI believes that it should receive a response
> sooner than 60 days to facilitate a more expeditious
> settlement to this REA and a 'Kick-off meeting in Seattle'
> to settle this matter.

(R4, tab 44 at 11) The REA was accompanied by a "FAR 33.207 Certification of Claim," dated 10 January 2014, that stated:[2]

> Pursuant to [Federal Acquisition Regulation] FAR 33.207,
> I Les Syme, Vice President, of CTI Construction, do
> hereby state the following:
>
> I certify that the claim is made in good faith; that the
> supporting data are accurate and complete to the best of
> my knowledge and belief; that the amount requested of
> $348,126.05 accurately reflects the contract adjustment for
> which the contractor believes the Government is liable;
> and that I am duly authorized to certify the claim on behalf
> of the contractor.

(R4, tab 44 at 1, 16)

On 3 February 2014, the government responded that it would treat the REA as a claim (R4, tab 45). CTI replied on 7 February 2014 that the REA "was being submitted to facilitate settlement discussions," withdrew its FAR 33.207 certification, and provided a certification for the REA under Department of Defense FAR Supplement (DFARS) 252.243-7002, stating:

---

[2] The certification was notarized on 9 January 2014; a discrepancy that we find immaterial.

6

> I certify that the request is made in good faith and that the supporting data are accurate and complete to the best of my knowledge and belief.

(R4, tab 46 at 2)

The parties then attempted to settle the matter, unsuccessfully (R4, tabs 47-55). On 30 April 2014, CTI supplemented the REA, requesting $606,176.42 (R4, tab 56 at 1, 10). The contracting officer responded to the REA on 14 July 2014, finding it without merit (R4, tab 62 at 1, 6).

By letter dated 16 July 2014, CTI requested a contracting officer's final decision on the REA, attaching a certification of the $606,176.42 amount in the language required by Contract Disputes Act (CDA), 41 U.S.C. § 7103(b) (R4, tab 63 at 2-3). Although the letter states that the certification is dated 16 July 2014, the certification is dated 17 July 2014, and a notary stated that she witnessed that the certification was signed on 17 July 2014 (R4, tab 63 at 2-3). The contracting officer stated that the government would act on the claim "based on a 16 July 2014 receipt date" (R4, tab 64); however, we find, based on the notary's statement, that the contracting officer received the claim certification on 17 July 2014.

On 19 August 2014, CTI filed an appeal from the 14 July 2014 response to the REA; we docketed that appeal as ASBCA No. 59507. On 12 September 2014, the government moved to dismiss ASBCA No. 59507 for lack of jurisdiction. In response CTI asserted that "the first Certified Claim was submitted on 10 January 2014 under FAR 33.207, which starts interest accruing as of the date the [contracting officer] receives the Certified Claim" (i.e., 10 January 2014)" (resp. at 4).

On 18 December 2014, the contracting officer denied the 17 July 2014 claim (R4, tab 2). CTI appealed on 5 January 2015; we docketed the appeal as ASBCA No. 59779 and consolidated it with ASBCA No. 59507. On 29 July 2015, we deferred the government's motion to dismiss ASBCA No. 59507 pending a decision upon entitlement.

During the 2015 hearing of the appeals, CTI's vice-president, who certified the 10 January 2014 REA (R4, tab 44 at 16), gave the following testimony on direct examination conducted by CTI's counsel:

> Q: Okay. And the REA that's contained at Tab Number 44 in the Rule 4 file, who prepared that for CTI?[3]

---

[3] At tab 44 of the Rule 4 file is found the 10 January 2014 REA.

7

A: We had to hire a consultant to put that together for us.

Q: And why did you hire a consultant?

A: I'm a guy in the field. Nobody -- we have to get experts to be able to put this together to do it the proper way. We just don't have the expertise.

Q: And did CTI submit this REA for purposes of litigating this case today?

A: I would say yes.

(Tr. 1/230)

## DECISION

*Jurisdiction*

The government challenges our jurisdiction to entertain ASBCA No. 59507, because, the government says, the appeal is from a decision regarding an REA, not a claim. CTI's apparent position is that the 10 January 2014 REA was and is a claim. Our jurisdiction to entertain an appeal under the CDA depends upon the existence of a contracting officer's final decision on a government or contractor claim, or a deemed denial of a contractor claim. *See* 41 U.S.C. §§ 7103(f)(5), 7104(a). A contractor claim need not be expressed in a particular form, but must manifest the intention to obtain a contracting officer's final decision. *Southern Automotive Wholesalers, Inc.*, ASBCA No. 53671, 03-1 BCA ¶ 32,158 at 158,998. A "claim" is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." *Air Services, Inc.*, ASBCA No. 59843, 15-1 BCA ¶ 36,146 at 176,426 (quoting FAR 2.101). We determine whether a contractor's submission is a CDA claim on a case-by-case basis, applying a common sense analysis. We may examine the totality of the correspondence between the parties in determining the sufficiency of a claim. *Id.*

A claim exceeding $100,000 must be certified in accordance with 41 U.S.C. § 7103(b). The language of that certification also appears at FAR 33.207. In such a case, interest accrues from the date that the contracting officer receives the certification. *See Industrial Contractors, Inc.*, ASBCA No. 31270, 91-3 BCA ¶ 24,053 at 120,421.

8

The certification of an REA under FAR 33.207 is evidence that an REA is intended as a claim. *See Southern Automotive Wholesalers*, 03-1 BCA ¶ 32,158 at 158,998. On the other hand, the certification of an REA under DFARS 252.243-7002 is evidence that an REA is not intended as a claim. *See Certified Construction Co. of Kentucky, LLC*, ASBCA No. 58782, 14-1 BCA ¶ 35,662 at 174,572. An REA can be converted into a claim by the provision of a CDA certification and a request for a contracting officer's final decision. *See id.*

On 10 January 2014, CTI submitted the REA to the contracting officer. Although the REA did not explicitly request a contracting officer's final decision, and suggested that the parties meet "to settle the matter," it requested a sum certain ($348,126.05), and was certified under FAR 33.207. It also stated the "understanding" that the government "ha[d] 60 days to respond" to the REA, which we take as a reference to the 60-day period within which the SATOC's disputes clause (and 41 U.S.C. § 7103(f)(1)-(2)) requires that, in general, a contracting officer render a decision on a contractor's claim. All those manifest that on 10 January 2014, CTI intended to obtain a contracting officer's final decision on the REA, and that, therefore, the REA was, on that date, a claim.[4] That conclusion is consistent with the much later hearing testimony of CTI's vice-president (who on 10 January 2014 certified the REA), that the REA was submitted "for purposes of litigating this case." Finally, CTI's position in response to the government's motion to dismiss was that "the first Certified Claim was submitted on 10 January 2014 under FAR 33.207, which starts interest accruing as of the date the [contracting officer] receives the Certified Claim" (i.e., 10 January 2014)" (resp. at 4). Upon this record, we find that when CTI first submitted the REA to the contracting officer, the REA was a claim, including for, as stated in the REA, the recission of liquidated damages.

However, on 7 February 2014, CTI withdrew the REA's FAR 33.207 certification, and certified the REA under DFARS 252.243-7002, indicating its intent that the REA no longer be treated as a claim, thereby converting it to a non-claim REA. Because the REA lost its claim status on 7 February 2014, the contracting officer's 14 July 2014 response to the REA is not a contracting officer's final decision denying a claim. Consequently, we lack jurisdiction to entertain the appeal from the contracting officer's 14 July 2014 response, and dismiss ASBCA No. 59507.[5]

---

[4] This finding is consistent with CTI's statement, in response to the government's motion to dismiss ASBCA No. 59507 for lack of jurisdiction, that as of 10 January 2014, "the [government] was obligated to review the REA and issue a Final Decision by 12 March 2014 [61 days later], or advise of a reasonable date by which the Final Decision would be issued" (resp. at 6).

[5] CTI appears to assert that we have jurisdiction in ASBCA 59507 as a direct appeal from the assessment of liquidated damages in 2013 (resp. at 3), but CTI's notice

9

Nevertheless, on 17 July 2014, CTI expressly requested a contracting officer's final decision on the REA, and provided the certification required under the CDA for requests exceeding $100,000, converting the REA once again into a claim. Because the contracting officer's 18 December 2014 decision denied that claim, we possess jurisdiction to entertain ASBCA No. 59779, CTI's timely appeal from that decision.

*Whether the government constructively changed the paving work*

CTI claims that the government constructively changed the paving work (app. br. at 4). We find no evidence that CTI performed paving work beyond that depicted in sketch 1 to the task order. Although CTI says that the statement of the government's project lead during the site visit that "we don't believe we have the money" to pave the east area caused it "not to bid the east area on the Sketch" (app. br. at 7), CTI contracted to pave that "east section," which is depicted in the lower right-hand corner of sketch 1 to the task order. Having failed to demonstrate that it performed any paving work in addition to that depicted in sketch 1, CTI is not entitled to additional compensation for paving.

*Whether the government delayed the roofing work*

CTI appears to claim entitlement to additional compensation for government-caused delays to roofing and paving work, contending that the government delayed the work by taking from 25 April 2013 through 17 June 2013 to issue Modification No. R00001 to account for what CTI says was a defective specification (app. br. at 8-9, 11-12; app. reply br. at 2-4). CTI fails to demonstrate such entitlement.

We assume that the specification that CTI says was defective is the original version of section 2.1 of the task order's statement of work, one of the subjects of Modification No. R00001. First, CTI does not explain how the specification was defective, and we see no obvious defect in that specification. Indeed, the principal difference between the original and modified sections 2.1 is that the former required the contractor to "evaluate the existing roof system and submit for information only design details for the new roofing system," and the latter required the contractor to "completely remove the existing roof system to the concrete deck," and "rebuild the roof by placing an adhered vapor barrier, 3 inches of closed-cell polyisocyanurate with glass reinforced mat facer insulation board." None of that strikes us as correcting a defect in the original, and CTI points to no expert testimony to the contrary. CTI points to the parties' agreement to the modification itself as evidence of a defect in the original specification (app. reply br. at 2), but the impetus behind the modification was CTI's notice to the

---

of appeal indicates that the appeal is only from the contracting officer's 14 July 2014 denial of the REA.

10

government that it had encountered water under the existing roofing system. That indicates a problem with roof conditions, not with the roofing specification.

Second, in order to recover under the Suspension of Work clause a contractor must prove that the work was suspended or delayed for an unreasonable period of time by an act of the contracting officer in administration of the contract, or by the contracting officer's failure to act within a reasonable time. *Strand Hunt Construction, Inc.*, ASBCA No. 55905, 13 BCA ¶ 35,287 at 173,188. CTI fails to demonstrate that the government unreasonably delayed the modification. In any situation involving such delays (for example, of the approval of shop drawings), a contractor is not entitled to any adjustment unless the delay is unreasonable. *H.Z. & Co.,* ASBCA No. 29776, 87-1 BCA ¶ 19,384, at 98,007. On 24 April 2013, CTI proposed roof removal and replacement to deal with water under the existing roofing system. The government rejected the recommendation the next day. Five days later, CTI again proposed roof removal. Two days later, the government asked how much that would cost; CTI answered 13 days after that. Nine days later, the government requested a cost proposal; five days after that, CTI provided that proposal. The parties negotiated for at least another 11 days. On 13 June 2013 CTI provided a price proposal, and on 17 June 2013, 54 days after CTI's 24 April 2013 notice of the existence of water under the existing roofing system, the parties signed Modification No. R00001, specifying roof removal and replacement.

None of that sequence of events strikes us as unreasonable government delay; it indicates the parties' diligent, cooperative, and successful efforts to grapple with an unexpected issue. Indeed, CTI cites no authority in support of its position, not even any in which analogous circumstances constituted unreasonable delay. We find no obviously unreasonable government delay during that period, which consists of several discrete segments of no more than 14 days each. *Cf. R.J. Crowley, Inc.*, ASBCA No. 35769, 88-3 BCA ¶ 21,151 at 106,786-88 (30 days to review submittals not found unreasonable).

*Whether the government constructively changed the "management team"*

CTI contends that the government constructively changed the contract to require a three-person management team instead of a two-person team, but fails to point to any record evidence in support of its apparent position that, after it was awarded the task order, the government insisted upon a three-person management team (app. br. at 9-10). We will not scour the record for such evidence, and, therefore, without deciding whether CTI was ultimately obligated to provide a three-person management team, we hold that CTI has failed to demonstrate entitlement to additional compensation on this issue.

11

*Whether the government constructively changed the contract's "fall arrest" system*

CTI claims that the government constructively changed the contract's "fall arrest" system; that is, the safety system that the task order required to prevent CTI's workers from falling off buildings while performing roofing work (app. reply br. at 4). The task order required a system capable of supporting three 300-pound persons; there is no evidence that the government changed that requirement. CTI claims that a constructive change was "caused by a combination of [a] Differing Site Condition and the Government's failure to respond to" CTI's request to provide only a two-person fall system, but a constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the changes clause, due either to an express or implied informal order from an authorized government official or to government fault. *Circle, LLC*, ASBCA No. 58575, 15-1 BCA ¶ 36,025 at 175,976. Because CTI does not demonstrate that it provided a fall arrest system beyond the three 300-pound person system that the task order required, it fails to demonstrate that the government constructively changed the task order's fall arrest system requirement. Consequently, CTI has failed to demonstrate entitlement to additional compensation on this issue.

*Whether CTI is entitled to recover the cost of professional consulting fees*

CTI claims entitlement, pursuant to FAR 31.205-33, to recover consulting fees incurred in the preparation of the 10 January 2014 REA (app. br. at 14). Although costs of professional and consultant services are allowable in some circumstances, FAR 31.205-33, states such costs are unallowable if incurred in connection with "claims or appeals or the prosecution of claims or appeals against the Federal Government." FAR 31.205-47(f)(1). We have held above that the 10 January 2014 REA was, when first submitted, a claim; indeed, CTI's vice-president, who certified the REA, testified that the 10 January 2014 REA was submitted for purposes of litigation. Moreover, although in its post-trial brief CTI appears to assert that there is no factual basis to conclude that the consulting fees were incurred for purposes of filing a claim (app. br. at 15), its earlier position in response to the government's motion to dismiss was that "the first Certified Claim was submitted on 10 January 2014 under FAR 33.207" (resp. at 4). Because the 10 January 2014 REA was, when submitted, a claim, any consulting fees incurred in the preparation of that REA are in connection with "claims or appeals or the prosecution of claims or appeals against the Federal Government," and, therefore, are unallowable. Accordingly, CTI is not entitled to recover the cost of professional consulting fees.

*Whether CTI is entitled to the rescission of liquidated damages*

CTI challenges the government's assessment of liquidated damages (app. br. at 12). The government has the initial burden of proving that CTI failed to meet the

completion date and that the period of time for which it assessed liquidated damages is correct. *KEMRON Environmental Services Corp.*, ASBCA No. 51536, 00-1 BCA ¶ 30,664 at 151,399. The government has met that burden. The original task order completion date was 11 June 2013, and was extended 90 days by Modification No. R00001, making the new completion date 9 September 2013. Work was completed on 1 November 2013, 53 days later. The task order provided for liquidated damages in the amount of $482 for each calendar day of delay; that amount times 53 equals $25,546, the amount that the contracting officer assessed.

CTI contends that it "had not agreed to [9 September 2013] as the new Contract Completion Date" and that "the emails regarding the negotiations on [Modification No. R00001] are clear that the duration agreed upon was to run 90 calendar days from 16 June 2013," but contradicts itself by stating that "Beneficial Occupancy occurred on 1 November 2013, 53 days past the Contract Completion Date" (app. br. at 8, 12, 30, ¶ 17). In addition, on 15 August 2013, CTI confirmed its understanding that the completion date was 9 September 2013, and reconfirmed that understanding on 7 October 2013. In any event, "[w]hen the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." *BAE Systems Technology Solutions & Services Inc.*, ASBCA No. 57581, 13 BCA ¶ 35,414 at 173,743. We find nothing ambiguous about the modification's provision that "[t]he contract completion date shall be extended by 90 calendar days by reason of this modification," and, therefore, do not look to the emails that CTI cites to interpret that provision.

Once the government establishes a *prima facie* case that its assessment of liquidated damages is accurate, the burden of proof shifts to the contractor to show why its failure to meet the contract completion date was excusable. *KEMRON*, 00-1 BCA ¶ 30,664 at 151,399. The contractor must prove that the delaying items complained of caused a delay to the completion of the project as a whole. *Id.* at 151,400. The delay must be to work on the critical path, because only work on the critical path affects when the project is completed. *Fru-Con Construction Corp.*, ASBCA Nos. 53544, 53794, 05-1 BCA ¶ 32,936 at 163,158-59.

On this record and briefing, we are persuaded that, consistent with CTI's 16 May 2013 notice to the government, CTI had to complete the roofing before commencing with paving, in order to avoid damaging newly-laid asphalt with the heavy equipment needed to perform the roofing work. It took the parties 54 days from the discovery of the water under the existing roofing to agree upon the roofing solution set forth in Modification No. R00001, delaying completion of the project as a whole by 53 days. That delay excuses the 53 days of delay upon which the liquidated damages were assessed, because paving could not commence until roofing was completed. Although the government contends that Modification No. R00001 precludes CTI from challenging the assessment of liquidated damages by pointing to

roof-related delays (gov't br. at 15), that modification contains no language releasing claims for delay to the work resulting from the discovery of water under the existing roofing and the search for a solution to that issue. Rather, we interpret the 90-day extension of the work as providing time to complete the roofing work, not the project as a whole. CTI has demonstrated entitlement to the rescission of the $25,546 in assessed liquidated damages.

## CONCLUSION

For these reasons, ASBCA No. 59507 is dismissed for lack of jurisdiction, and ASBCA No. 59779 is sustained to the extent that $25,546 in liquidated damages be rescinded, with interest from 17 July 2014, the date that the contracting officer received the claim certification notarized on that date.

Dated: 20 October 2016

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

14

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59507, 59779, Appeals of Creative Times Dayschool, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
